ARTICULATE SYSTEMS, INC.

v.

APPLE COMPUTER, INC.

Civil Action No. 96–10345–RGS.

United States District Court,
D. Massachusetts.

May 11, 1999.

Trinidad Arriola–Kern, Palo Alto, CA, pro se.

Marta Beckwith, Palo Alto, CA, pro se.

Monique L. Cordray, La Jolla, CA, pro se.

Jonathan G. Graves, Washington, DC, pro se.

David L. Hayes, Palo Alto, CA, pro se.

Mark J, Hebert, Boston, MA, pro se.

John P. Iwanicki, Boston, MA, pro se.

Joseph P. Lavelle, Washington, DC, pro se.

Jolynn M. Lussier, Boston, MA, pro se.

Dale A. Malone, Boston, MA, pro se.

David C. McIntyre, Washington, DC, pro se.

Jennifer T. Miller, Boston, MA, pro se.

Charlene M. Morrow, Washington, DC, pro se.

Christopher N. Olsen, Washington, DC, pro se.

Howard G. Pollack, Menlo Park, CA, pro se.

James H. Pooley, Menlo, Park, CA, pro se.

Fabrizio F.R. Rasetti, Washington, DC, pro se.

Susan M. Reid, Palo Alto, pro se.

Robert F. Ruyak, Washington, DC, pro se.

Thomas J. Scott, Washington, DC, pro se.

Michael H. Shanahan, Boston, MA, pro se.

John M. Skenyon, Boston, MA, pro se.

Edwin H. Wheeler, Menlo Park, CA, pro se.

### ORDER ON REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF PATENT INVALIDITY

STEARNS, District Judge.

I *ADOPT* the Magistrate Judge's Recommendation that summary judgment for defendant Apple Computer, Inc., be *DENIED,* although on a somewhat different ground than the one cited by the Magistrate Judge.

■ As the Magistrate Judge correctly states, a party challenging a presumptively valid patent must produce clear and convincing evidence of the patent's invalidity. It is only when this threshold showing is made that the burden falls on the patentee to come forward with evidence sufficient to raise a dispute of material fact. The Magistrate Judge, in his Report, went further than perhaps necessary by focusing on plaintiff Articulate Systems, Inc.'s rebuttal evidence (which he found sufficiently disputatious), rather than on Apple's preliminary showing (which he generously assumed to be "clear and convincing"). As to this latter proposition, I am doubtful, based on the Magistrate Judge's careful examination of the evidence. As his analysis demonstrates, much of what Apple has offered at the summary judgment stage is speculative, confusing, inadmissible hearsay, or dependent on compound inferences that a finder of fact might or might not draw in Apple's favor. While a jury, after hearing all of the evidence might well (as the Magistrate Judge acknowledges) rule in Apple's favor, I am not prepared to say that as a matter of law it has at this time produced clear and convincing evidence of invalidity.[1]

SO ORDERED.

### REPORT AND RECOMMENDATION REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT THAT PLAINTIFF'S PATENT IS INVALID UNDER 35 U.S.C. § 102(b) (DOCKET NO. 35)

KAROL, United States Magistrate Judge.

Plaintiff, Articulate Systems, Inc. ("Articulate"), holds United States Patent 5,377,303 ("the '303 patent") on certain voice recognition software. The software allows a computer's operating system to recognize voiced utterances and convert them into recognizable commands, thus permitting the user to command the operating system through the use of his or her voice. Articulate claims in this lawsuit that Defendant, Apple Computer, Inc. ("Apple"), is offering a software product entitled PlainTalk that infringes the '303 patent. Pending before the court are Apple's four motions for summary judgment or partial summary judgment, which maintain that, based upon undisputed facts, Articulate's patent is invalid as a matter of law. This Report and Recommendation addresses only the first of the four motions, in which Apple asks for summary judgment on the ground that the invention claimed in the '303 patent was on sale or in use more than one year before Articulate applied for the patent. For reasons set forth below, I recommend that the motion be DENIED.

---

1. I do not agree with Apple's objection that the Magistrate Judge improperly applied a "totality of the circumstances" test in his analysis of the on-sale bar rule contrary to the holding of *Pfaff v. Wells Electronics,* 525 U.S. 55, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998). As the Magistrate Judge points out, *Pfaff* criticized the use of the test in determining whether an invention had been sufficiently developed to trigger the on-sale bar. It did not reject the test when applied "to determine whether an invention was sufficiently in public use ... to trigger the in-use bar." Report, at 7 n. 1. The Magistrate Judge's focus through the lens of Articulate's rebuttal on Apple's evidence may have given Apple the impression that he was misapplying the test.

## I. Overview of Summary Judgment Motions

In brief, Apple's four motions for summary judgment are as follows:

A. *Defendant Apple Computer, Inc.'s Motion for Summary Judgment that Plaintiff Articulate Systems, Inc.'s Patent Is Invalid Under 35 U.S.C. § 102(b) (Docket No.35).* In this motion, Apple claims that the '303 patent is invalid because an Articulate product embodying the claimed invention was in public use and on sale in the United States more than one year prior to the filing date of the application for the patent. This is the only motion that will be considered below.

B. *Defendant Apple Computer, Inc.'s Motion for Partial Summary Judgment as to the Date of Notification of Alleged Infringement (Docket No. 107).* In this motion, Apple claims that December 6, 1995 is the date of notice of Apple's alleged infringement of the '303 patent, and that earlier claimed notice was legally insufficient under 35 U.S.C. § 287(a).

C. *Defendant Apple Computer, Inc.'s Motion for Partial Summary Judgment that Articulate is not Entitled to Damages for Foreign Sales (Docket No. 129).* In this motion, Apple claims that because patent protection extends only within the United States, Articulate is not entitled to damages for allegedly infringing products manufactured, assembled, and sold outside the United States.

D. *Defendant Apple Computer, Inc.'s Motion for Summary Judgment that Articulate's Patent is Invalid for Indefiniteness (Docket No. 135).* In this motion, Apple claims that Articulate's patent is indefinite and therefore invalid under 35 U.S.C. § 112 for its failure to define or clarify the meaning of "higher level events" within the '303 patent.

The three remaining motions will be considered separately.

## II. Overview of Legal Standards

The standard for summary judgment is familiar. Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Seal–Flex, Inc. v. Athletic Track & Court Constr.,* 98 F.3d 1318, 1321 (Fed.Cir.1996). At the outset, the "party moving for summary judgment bears the burden of identifying the evidence that demonstrates the absence of a disputed material issue of fact and establishes that the moving party is entitled to judgment as a matter of law." *Seal–Flex,* 98 F.3d at 1321 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If the moving party meets this burden, the opposing party, to avoid summary judgment, "must respond with sufficient evidence to show that there is a material factual dispute and that, on the non-movant's evidence, the movant is not entitled to judgment as a matter of law." *Id.* In reviewing the nonmovant's case, the court must "view[ ] the evidence and draw[ ] factual inferences favorable to the party opposing the motion." *Id.* (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548).

Where, as here, the party moving for summary judgment is challenging the validity of a patent, it must present evidence sufficient to overcome the presumption of patent validity. *See* 35 U.S.C. § 282 (West 1984 & Supp.1998). To be sufficient, such evidence must be "clear and convincing." *E.g., Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1216 (Fed.Cir.1998). If the moving party makes such a showing, the opposing party has the burden of coming forward with sufficient rebuttal evidence to raise a genuine issue of material fact, but "the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation." *Mas–Hamilton,* 156 F.3d at 1216.

This overview suggests that there are at least three approaches a patentee such as Articulate might conceivably take in opposing a motion for summary judgment claiming patent invalidity. First, it might take the bull by the horns and file a cross motion for summary judgment, in which it argues that it is the party entitled to summary judgment on the issue of validity, on the ground that the challenger's evidence fails as a matter of law to satisfy the "clear and convincing" standard of proof. Second, it might take the risky position that it is not required to present any evidence in opposition to the summary judgment motion, for the reason that the moving party's evidence, falling short of satisfying the "clear and convincing" standard, fails to make out a prima facie case of invalidity. Finally, there is a third approach, in which the patentee, without necessarily conceding that the moving party has made out a prima facie case of invalidity, actually comes forward with evidence to rebut the moving party's arguments. This is the approach that Articulate has taken here.

III.   Invalidity under 35 U.S.C. § 102(b)

35 U.S.C. § 102(b) provides in pertinent part:  "A person shall be entitled to a patent unless—... the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States...." 35 U.S.C. § 102(b).  Since both the statute and case law distinguish between "use" and "sale," each term will be analyzed separately.

A.   Public Sale

The question of whether an invention was "on sale" at a given time is an issue of law, albeit one "based upon underlying issues of fact." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 103 F.3d 1538, 1544 (Fed.Cir.1997). "A determination that an invention was on sale within the meaning of section 102(b) requires that 'the claimed invention asserted to be on sale was operable, the complete invention claimed was embodied in or obvious in view of the device offered for sale, and the sale or offer was primarily for profit rather than for experimental purposes.' " *Micro Chem.*, 103 F.3d at 1544 (citing *KeyStone Retaining Wall Sys., Inc. v. Westrock, Inc.*, 997 F.2d 1444, 1451 (Fed. Cir.1993)).  As the foregoing quotation suggests, an actual sale is not required. The on-sale bar may also be triggered by a mere offer to sell, provided the offer was "objectively manifested" and "definite," and is proven by clear and convincing evidence.  *Envirotech Corp. v. Westech Eng'g Inc.*, 904 F.2d 1571, 1574, 1575 (Fed.Cir.1990) (party asserting the bar "must prove by clear and convincing evidence ... that there was a definite sale or offer to sell more than one year before the application for the subject patent").  Although a mere offer may under some circumstances be enough, it is also important to note that market exploration without more will not trigger the bar.  *Seal–Flex*, 98 F.3d at 1324 ("summary disposition is negated" when there is a genuine question "whether the inventor was merely exploring the market or had made an unconditional offer to sell a completed invention").  Of significance for present purposes, Apple has not cited, and my independent research has not found, any case extending the on-sale bar to unsolicited offers by prospective customers to purchase.  Indeed, case law seems to be to the contrary.  *See Mas–Hamilton*, 156 F.3d at 1217 (no "definite sale or offer for sale" made, and, therefore, no on-sale bar triggered, where prospective purchaser merely "provided a purchase order that was never filled" and where "no agreement was reached about the particulars" of the device to be purchased).

The on-sale bar reflects a number of policies essential to the operation of the patent system, including "discouraging removal of inventions from the public domain that the public reasonably has come to believe are freely available;  favoring the prompt and widespread disclosure of in-

ventions; allowing the inventor a reasonable amount of time following sales activity to determine the potential economic value of a patent; and prohibiting the inventor from commercially exploiting his invention beyond the statutorily prescribed time." *Envirotech*, 904 F.2d at 1574.

■ Until recently, there had been some uncertainty regarding how far along a new invention had to be in its conception, development, and commercial viability before the on-sale bar could be triggered. While it had long been held that an invention that had been reduced to practice would trigger the bar if it were definitely sold or offered for sale more than a year before the so-called critical date, *e.g.*, *Evans Cooling Sys., Inc. v. General Motors Corp.*, 125 F.3d 1448, 1452 (Fed.Cir.1997), it had also long been clear that reduction to practice was not an absolute requirement. *E.g.*, *UMC Elecs. Co. v. United States*, 816 F.2d 647, 656 (Fed.Cir.1987). Until recently, the Federal Circuit had applied a "totality of the circumstances" test to determine whether a new invention was sufficiently developed, in light of the policies underlying the bar, to warrant a determination that it had been sold or offered for sale for purposes of § 102(b). *E.g.*, *Micro Chem.*, 103 F.3d at 1544; *Envirotech*, 904 F.2d at 1574. This "totality of the circumstances" approach, however, was criticized as "necessarily vague" by the Supreme Court in *Pfaff v. Wells Electronics*. 525 U.S. 55, —— & n. 11, 119 S.Ct. 304, 311 & n. 11, 142 L.Ed.2d 261 (1998). The *Pfaff* Court agreed with the Federal Circuit both that reduction to practice would suffice to trigger the bar in an appropriate case and that reduction to

practice was not an absolute requirement for doing so. 525 U.S. at ——, 119 S.Ct. at 311. But in determining what activity short of reducing the invention to practice might suffice, the Court held that it would be enough if the "inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at ——, n. 14, 119 S.Ct. at 312 & n. 14. In light of *Pfaff*, the Federal Circuit has ceased using the "totality of the circumstances" test in its analysis of the on sale bar. *See Weatherchem Corp. v. J.L. Clark, Inc.*, 163 F.3d 1326, 1333 (Fed.Cir.1998) (court will no longer "balanc[e] various policies according to the totality of the circumstances as may have been done in the past").[1]

■ Against this background, we are in a position to examine the evidence Apple proffers in support of its claim that the invention embodied in the '303 patent was on sale more than a year before the application for that patent was filed. That evidence can be grouped into three categories: (1) evidence that, prior to the critical date, three prospective customers offered to purchase a product called Voice Navigator, which product Articulate had previously demonstrated to them and which embodied at least some of the claims (and the only independent claim) set forth in the '303 patent;[2] (2) evidence that Articulate applied to the United States Patent and Trademark Office ("PTO") to obtain federal registration for a "Voice Navigator" trademark and claimed, in its application, that the trademark was first used in interstate commerce on a date that preced-

---

**1.** To minimize the possibility of later confusion, it should be noted that the "totality of the circumstances" test criticized in *Pfaff* and abandoned in *Weatherchem* is a different "totality of the circumstances" test than the one that is still used (and is discussed below) to determine whether an invention was sufficiently in public use more than a year before the critical date to trigger the in-use bar. The former "totality of the circumstances test" addresses the stage of product development;

the latter test of the same name addresses the type and degree of use and display that suffices to constitute a public use for purposes of 35 U.S.C. § 102(b).

**2.** The significance of these demonstrations will also be considered below (Section III.B) in the discussion of Apple's claim that the invention was in "public use" prior to the critical date.

ed the critical date; (3) and reports in various trade publications to the effect that Articulate had sold Voice Navigator or offered it for sale prior to the critical date.

For its part, Articulate does not deny that it first applied for its patent on June 23, 1989, making June 23, 1988 the critical date; that, prior to the critical date, it did demonstrate to at least four prospective customers a prototype version of Voice Navigator, which prototype embodied what became independent claim 1 of the '303 patent, as well as at least three other dependent claims (2, 14, and 25). Pl.Supp. Mem., Docket No. 177, at 4;[3] that, prior to the critical date, it did receive an order, a letter of intent to purchase, and a written expression of interest, respectively, from three of those prospective customers; that it did represent in its trademark application that the words "Voice Navigator" were first used in interstate commerce on a date that would have preceded the critical date; and that various trade publication reported that sales or offers to sell a product embodying some of the claims of the '303 patent were made prior to the critical date. Articulate steadfastly denies, however, that it ever sold or offered to sell any product embodying any claim of the '303 patent prior to the critical date or even that it had an actual product that was available for sale. Further, it insists that it conducted all pre-critical date demonstrations on a confidential basis, and it dismisses as unreliable and inadmissible hearsay any trade press accounts to the effect that sales or offers to sell were made prior to the critical date. In order to evaluate the strength of the parties' conflicting positions, closer analysis of the evidence in the summary judgment record—particularly evidence regarding pre-critical date demonstrations—is required.

Generally speaking, the evidence regarding demonstrations by Articulate of a prototype of Voice Navigator in the spring of 1988 is sketchy and incomplete at best. More significant for summary judgment purposes, it is genuinely conflicting on the question of whether Articulate made a definite sale or offer to sell a product embodying any of the claims of the '303 patent prior to the critical date. Analysis most conveniently begins with the Declaration of Ivan Mimiça. Docket No. 56 ("Mimiça Decl."). In his declaration, Mimiça identifies himself as President and Chief Executive Officer of Articulate and as a person with personal knowledge of the facts set forth in the declaration. Mimiça Decl. at ¶ 1. He describes the state of development of the software product that later became known as Voice Navigator, beginning with its earliest incarnations in the spring of 1988 through the date of commercial release in October 1988. He asserts, unequivocally, that Articulate did not deem Voice Navigator to be a commercially viable product prior to October 1988, and, for this reason, it did not sell, offer or agree to sell, accept any orders or receive any money for, distribute, ship, give away, or leave with any prospective customer any version of Voice Navigator or any prototype of such product prior to the June 23, 1988 critical date. *Id.* at ¶¶ 13, 20, 23.

Although Mimiça denies that Articulate made any pre-critical date sales or offers to sell Voice Navigator or any prototype, he concedes that it demonstrated a prototype of Voice Navigator to at least four companies as early as March and April 1988. *Id.* at ¶¶ 15, 16.[4] Mimiça maintains, however, that each party to whom a demonstration was made orally agreed to preserve confidentiality. *Id.* at ¶ 17. At the time of the demonstrations, according to Mimiça, Articulate was unfamiliar with the

---

3. As to these claims, at least, there can be no doubt that the invention had reached a sufficient stage of development to trigger the on-sale bar, if a definite sale or offer to sell was in fact made prior to the critical date. *See Pfaff*, 525 U.S. at ——, 119 S.Ct. at 312.

4. As previously noted, it is now undisputed that the prototype that was demonstrated on these occasions embodied what is now claim 1—the only independent claim—of the '303 patent.

potential market for voice recognition software and did not know whether it would be successful in transforming its invention into a commercially viable product. *Id.* at ¶ 16. Hence, in Mimiça's words, it used the demonstrations solely "as a baseline for further development work" and "to get some information as to the possible market for a voice recognition product before going on with the project." *Id.* at ¶¶ 16, 23. In other words, while not using the precise language found in the case law, Mimiça draws a distinction recognized therein between "exploring the market" for a product still in its conceptual stage and exploiting the market, through definite attempts to sell a product whose development is at or near completion. *Seal–Flex*, 98 F.3d at 1324. The latter is sufficient to trigger the on-sale bar; the former is not.

Neither the Mimiça declaration nor any other evidence in the summary judgment record discloses the particular attributes or capabilities of the invention that were demonstrated prior to the critical date; nor does any evidence reveal the precise manner in which the demonstrations were conducted or what specific discussion accompanied the demonstrations. In particular, the record is silent concerning the extent to which Articulate maintained exclusive control over the prototype during the demonstrations or, instead, allowed the other party to examine and operate it at will; the extent to which the demonstrations inured to the benefit of such other party (such as by enabling it to run its own software applications through the use of voice commands); or the extent to which Articulate attempted to exploit the commercial opportunities that the demonstrations presented not merely to "explore the market" but to promote the sale of products whose development was nearing completion. To prevail at the summary judgment stage, Apple is thus faced with the formidable task of conclusively disproving by inference alone an eyewitness' explicit denial that sales activity occurred. Given the near impossibility of the task, it is no

reflection on Apple's advocacy skills to state that its effort bears no fruit.

Turning from the general to the specific, the first demonstration was apparently made to ClinMan, Inc. ("ClinMan"), a company that was developing workstations for physicians. Mimiça Decl. at ¶ 18. Mimiça states that Articulate "demonstrated the prototype on a confidential basis" to ClinMan in March 1988; that ClinMan "expressed an interest in our system;" that Articulate and ClinMan entered into an agreement to market the first commercial version of Voice Navigator in October 1988; and that "Articulate never sold or offered to sell anything to ClinMan before October 1988." *Id.*

Approximately one month after the demonstration, ClinMan expressed an interest in entering into a business relationship with Articulate. Specifically, in a letter to Articulate dated April 22, 1988, ClinMan stated: "[W]e would like to enter into a licensing agreement with Articulate Systems, Inc. for a substantial number of units in the next several years. We would also like to work co-operatively with you on future enhancements and developments of your product for end-user applications in the health and legal fields." *Exhibits to Defendant Apple Computer, Inc.'s Memorandum in Support of its Motion for Summary Judgment that Plaintiff Articulate Systems, Inc.'s Patent is Invalid under 35 U.S.C. § 102(b)* ("Exhibit Index"), Docket No. 39, Tab H. The summary judgment record includes a declaration by Dr. Paul Gertman, the author of the letter. *Declaration of Dr. Paul Gertman* ("Gertman Decl."), Docket No. 54. Dr. Gertman states that he "understood that Articulate's product was not commercially available" as of April 22, 1988. Gertman Decl. at ¶ 6. Accordingly, he says, "th[e] letter was intended to be my expression of my commitment to Articulate ... to forming a business relationship with Articulate once Articulate fully developed its speech product." *Id.*. With respect to the demonstration itself, Dr. Gertman states only that it

occurred in Articulate's offices; that Mimiça showed him "an early prototype of a Macintosh-based speech system that Articulate had been developing;" and that he and Mimiça "spent an interesting afternoon debating the pros and cons of a Macintosh-based speech system versus an IBM-based unit." *Id.* at ¶ 3. Finally, Dr. Gertman states that ClinMan and Articulate entered into a distributorship agreement in October 1988 and that ClinMan first purchased product from Articulate in 1989 or 1990. *Id.* at ¶ 7.

This then is the full extent of the summary judgment record with respect to the ClinMan demonstration.[5] In the face of Mimiça's unequivocal denial that Articulate sold or offered to sell anything to ClinMan during the demonstration or at any other time prior to October 1988, of Dr. Gertman's corroborating Declaration, and of the absence of direct evidence contradicting Mimiça or Gertman, it would certainly not be unreasonable for a factfinder to conclude that no definite sale or offer to sell was made during the demonstration. ClinMan's strong expression of interest within one month of the demonstration in developing a business relationship with Articulate might give that factfinder pause, but it would certainly not make such a conclusion irrational.[6] Therefore, Apple is not entitled to summary judgment based on the application of the on-sale bar to Articulate's dealings with ClinMan.

The summary judgment record concerning the second demonstration given in March 1988, though perhaps slightly more favorable to Apple than the record concerning the ClinMan demonstration, is even more sparse. According to Mimiça, a prototype was "demonstrated ... on a confidential basis to representatives of Computer Learning Systems, a company that was developing computer tools for teaching people language skills." Mimiça Decl. at ¶ 19. Once again, the record is silent concerning what specific attributes and capabilities were demonstrated, the precise manner in which the demonstration was conducted, the extent to which Articulate maintained exclusive physical control of the prototype during the demonstration, whether the demonstration conferred some tangible benefit on Computer Learning Systems, or what was said during the demonstration about the prospect of future products or sales. Mimiça acknowledges that Computer Learning Systems "was interested in Articulate's new technology," but, again, he states unequivocally that "Articulate never sold or offered to sell anything to this company prior to October, 1988," and that it was not until December 1988 "that Articulate took its first order from Computer Learning Systems." *Id.*

If this were the full extent of the record concerning this particular demonstration, it would be difficult to see how the on-sale

---

**5.** Apart from evidence regarding the demonstration, the record includes a draft, unsigned "License Agreement" between Articulate and ClinMan dated May 18, 1988. Ex. 4 attached to Def. Reply Mem., Docket No. 67. The subject matter of the draft agreement appears to be Articulate's voice recognition software technology, which is to be "incorporated into proprietary application software developed by Clinman ... for subsequent sale or license to ClinMan clients...." The draft agreement adds nothing to Apple's position, not just because it is an unsigned draft about which the record provides no information, but because the law clearly distinguishes for purposes of the on-sale bar between, on the one hand, the granting or sale of rights in the invention and, on the other, the sale of the invention itself or of devices incorporating it. *Mas–Hamilton,*

156 F.3d at 1216–17 (distinguishing for purposes of on sale bar between "mere[ ] ... potential licensee of legal rights" in patent and "potential customer of devices"); *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1267 (Fed.Cir.1986) ("an assignment or sale of rights in the invention and potential patent rights is not a sale of the invention within the meaning of section 102(b)").

**6.** A more difficult question would be whether ClinMan's mere expression of interest in pursuing a business relationship with Articulate would support a rational inference that a definite sale or offer to sell *was* made prior to the critical date. This is a question that need not be addressed at this time.

bar would even arguably come into play. Apple's position is marginally improved, however, by a second document in the summary judgment record—a "letter of intent" dated March 29, 1988 from Computer Learning Systems to Mimiça. The letter states in pertinent part:

> This is our Letter of Intent to purchase your voice recognition product in the quantities as outlinned [sic] in our previous memo dated 3/14/88.
>
> Our initial need from you is a board that will enable us to proceed with the development of a demo model to use at the American Correctional Association show in Michigan on July 9th.

Exhibit Index, Tab E. The summary judgment record does not appear to include a copy of the "previous memo dated 3/14/88," but the March 29 letter might itself support an inference that some discussion concerning the purchase of a "voice recognition product," or at least a "board," did take place when the prototype was demonstrated. To say, however, that an inference *could* be drawn that sales talk took place contemporaneously with the demonstration is by no means to say that it *must* be drawn, let alone that, contrary to Mimiça's express denial, an actual sale was concluded or a definite offer to sell was made.[7] Apple thus overstates its case in its reply memorandum, where it attempts to convert a permissible inference into a mandatory one by arguing that "[t]he letter from Computer Learning Systems was not written in a vacuum and must have been responding to a representation by Articulate that its product could, in fact, be purchased." Def. Reply Mem. at 10. Although Apple's argument is not implausible and might ultimately prove persuasive to the factfinder, it does not carry the day on a motion for summary judgment in the face of Mimiça's explicit denial that Articulate made any such representation. Mimiça Decl. at ¶ 18.

Details concerning the third demonstration are also in short supply. Mimiça tells us only that the demonstration was conducted in March 1988; that it was given on a confidential basis to Lockheed Engineering & Science Corporation ("Lockheed") at Lockheed's facilities in Houston, Texas; that it included the use of a specially configured prototype of Voice Navigator in conjunction with "a simulation program that NASA had developed to test the helmet-mounted screen displays" for spacesuits that could be controlled by voice commands; that "Articulate never sold or offered to sell anything to Lockheed at that time;" and that Articulate did not "leave its prototype with Lockheed or send one to Lockheed." Mimiça Decl. at ¶¶ 15, 20. We also know from the record that Lockheed acknowledged and expressed its appreciation for the demonstration in a letter to Articulate dated April 25, 1988, and it asked in its letter for "further information about becoming a prototype test site." Exhibit Index, Tab I. The foregoing evidence is probably not even sufficient to support a rational inference that a definite sale or offer to sell was made to Lockheed during the demonstration; it certainly does not compel a conclusion as a matter of law that it was.

██ The only other evidence in the summary judgment record concerning early interaction between Articulate and Lockheed or attempts to use Voice Navigator in conjunction with the helmet-mounted screen displays of spacesuits is confusing. For example, a July 19, 1988 article in the trade publication *MacWeek* reported, favorably to Articulate's position here, that Articulate did not intend to release Voice Navigator until the following fall. Exhibit Index, Tab G, 008183. The article went on to state, however, that "NASA has already used the product to develop a stack designed to prototype a helmet system that the space agency plans

7. Indeed, it seems clear that, despite Computer Learning Systems' hope for early delivery of a "voice recognition product" or "board," no such delivery was made in time for use at a July 9th show.

to use in the 1990s" and that "NASA already has connected the Mac and Voice Navigator to prototypes of future helmets in which astronauts will see the information and controls projected directly onto the visors of their helmets." *Id.* at 008184. It is not clear what to make of this article. In the first place, as Articulate observes, it is inadmissible hearsay and, therefore, may not be considered on a motion for summary judgment. FEDR. CIVPR. 56(e) ("supporting and opposing affidavits shall set forth such facts as would be admissible in evidence."); *Scosche Indus., Inc. v. Visor Gear Inc.*, 121 F.3d 675, 680–81 (Fed.Cir.1997); *Finn v. Consolidated Rail Corp.*, 782 F.2d 13, 16 (1st Cir.1986); *see* Pl. Opp'n, Docket No. 52, at 18; Pl.Resp. to Def.'s Statement of Undisputed Material Facts, Docket No. 53, at 6. Further, it is not clear from the article when precisely NASA first purported to use Voice Navigator; how and when it obtained a prototype, assuming it did; or what the connection was, if any, between NASA's purported use of Voice Navigator and the March 1988 Lockheed demonstration.

A NASA report dated December 1990 concerning the use of a speech recognition interface in conjunction with a helmet-mounted screen display is also included within the summary judgment record, but it does not clarify these issues. Exhibit Index, Tab L. For example, the report states that the helmet-mounted display that NASA tested in conjunction with Voice Navigator was constructed by Hamilton Standard and delivered on an unspecified date during June 1988, but it says nothing about when NASA first tested that display using a prototype of Voice Navigator or about the circumstances under which it first obtained such a prototype. *Id.* at 006167–69.[8] If it did obtain a prototype, it conceivably purchased it, but the record does not conclusively establish that it did, let alone that a sale of the prototype

preceded the critical date. Apple is therefore not entitled to summary judgment based on its contention that Articulate's pre-critical date dealings with Lockheed (or NASA) triggered the on-sale bar.

The fourth demonstration was made in April 1988 to RimpexChile, a telecommunications company based in Santiago, Chile. We begin again with Mimiça's account, which, characteristically, is short and uninformative regarding what actually occurred during the demonstration, but unequivocal in its insistence that: (1) the demonstration was confidential and (2) Articulate did not sell or offer to sell anything to RimpexChile during the demonstration or at any other time prior to the critical date. Mimiça Decl. at ¶ 22.

Looking beyond Mimiça's Declaration, the record also includes a letter dated May 4, 1998 from RimpexChile to Articulate. Exhibit Index, Tab D; a declaration by the author of the letter, Javier R. Vasquez ("Vasquez Decl."), Docket No. 57; and a "proforma invoice" dated July 11, 1988, Ex. 2 attached to Def. Reply Mem. The invoice, dated three weeks after the critical date, merits no discussion, but the May 4 letter does. The body of the letter states, in its entirety (and without editorial correction):

> The present letter confirm a commitment for 2000 units / for the first year.
>
> The amount commited obey to the product features and specifications demonstrated at my visit to Boston, April 14 til 16, and considering the exclusive representation for the Latin American Market, as we state in the marketing survey handle it to you March 1988.
>
> After Rimpex get Demo units for the marketing presentation during July 1988 in Santiago Chile, we can forecast the following years regarding, sales quantities and support required.
>
> We expect to have a very profitable business relation in the future and we

---

**8.** Articulate claims that it did not deliver a product to Lockheed until sometime after October 1988. Pl.Resp. to Def.'s Statement of Undisputed Material Facts at 6.

wait confirmation for distributor prices and delivery dates.

Exhibit Index, Tab D. With reference to this and the similar, pre-critical date letter of intent from Computer Learning Systems, Apple asks rhetorically, "If Articulate did not offer its product for sale, then why would the customers commit to thousands of units." Def. Reply Mem. at 8–9. To Apple, the answer is not only obvious but logically irrefutable: "The undeniable inference that can be drawn from the correspondence from customers is that, during the demonstrations of the Voice Navigator, Articulate made offers to sell the product to which these companies were responding." *Id.* at 8. But again, although Apple's argument is not implausible and might ultimately prove persuasive to the factfinder, Apple is mistaken in its belief that the inference is "undeniable" that Mimiça's account is false. After hearing all the evidence and observing the demeanor of witnesses, a rational factfinder might well conclude that Mimiça was indeed telling the truth and that the enthusiasm demonstrated by prospective customers such as RimpexChile and Computer Learning Systems was simply their spontaneous and unsolicited response to what they considered to be a very impressive demonstration. Indeed, this is just how Vasquez, in his Declaration, explains his reaction:

> Mr. Mimiça told me that the product was still in the development stages and did not offer to sell me any products then. Because of my enthusiasm about the product, I told Mr. Mimiça that Rimpex Chile would be willing to represent Articulate in Latin America when the product was ready for sale. He told me to keep our discussions confidential and to not disclose to anyone anything about Articulate's prototype product....
>
> I have reviewed my May 4, 1988 letter to Mr. Mimiça.... The letter simply represents my firm interest in becoming a distributor for Articulate, based on the demonstration of the prototype that I had seen at Articulate's offices. I knew that a commercial product was not yet available at this time.

Vasquez Decl. at ¶¶ 3–4. Of course, the factfinder might also ultimately reject Vasquez's explanation as the self-serving account of an exclusive distributor who has no desire to ruffle the feathers of its long-standing supplier or, for that matter, to jeopardize the patent protection of a product that had been very profitable over the years. It is not, however, the role of a court to weigh conflicting evidence on a motion for summary judgment.[9] To the contrary, all inferences must be drawn in favor of the party opposing the motion. Therefore, Apple is not entitled to summary judgment based on its argument that the inference is "undeniable" that a definite sale or offer to sell was made in conjunction with the RimpexChile demonstration.

Although this completes the review of the evidence in the summary judgment record concerning pre-critical date demonstrations, Apple relies on two other categories of evidence in support of its argument

---

9.  Apple proposes a simple means of circumventing the prohibition against courts weighing evidence on motions for summary judgment. Citing *Sinskey v. Pharmacia Ophthalmics, Inc.,* 982 F.2d 494, 499 (Fed.Cir. 1992), it says the court should simply "disregard Mr. Vasquez's '[p]ost-hoc affidavit testimony.'" *Sinskey* is inapposite, however. Unlike the present case, which concerns an issue of objective fact, *i.e.,* whether a definite offer to sell was objectively manifested, *Sinskey* raised the narrow question whether an inventor's "subjective experimental intent" may ever take precedence over contrary objective evidence that would otherwise establish that a particular use was non-experimental. Apple has not cited, and the court's independent research has not found, any case that supports the extraordinary proposition that the sworn testimony of an eyewitness to an event concerning what the witness perceived at that event may be "disregarded" on a motion for summary judgment whenever the event occurred some years earlier and the testimony conflicts with inferences that other evidence would arguably support.

in favor of summary judgment based on the on-sale bar. The second category of evidence relates to Articulate's attempt in November 1988 to obtain federal registration for the trademark "Voice Navigator," pursuant to 15 U.S.C. § 1051.

■ As Apple notes, Articulate's application for registration states that Articulate first used the Voice Navigator trademark on goods in interstate commerce on May 31, 1988. Exhibit Index, Tab C. Apple argues that this necessarily implies that Voice Navigator was sold prior to the critical date, because, for purposes of federal trademark law, the term "use in commerce" is defined to mean, *inter alia*, that the trademark was affixed to goods that were "sold or transported in commerce." *See* 15 U.S.C § 1127. Accusing Apple of ignoring the word "or" in the statutory phrase "sold or transported in commerce," Articulate responds that its application for registration was based not on the sale of Voice Navigator or of a prototype, but on the interstate transportation of a prototype bearing the trademark from Articulate's West Coast offices to its East Coast offices, for the purpose of conducting the Spring 1988 demonstrations. Def. Opp'n at 13; Mimiça Decl. at ¶ 17.[10] Apple counters by citing McCARTHY ON TRADEMARK AND UNFAIR COMPETITION, J. THOMAS MCCARTHY, § 19:118, for two propositions: first, that "'transportation' as an alternative to 'sale' requires some element of 'open or public use before potential customers'" and, second, that "purely intra-company shipments only for in-house experimentation, evalua-

tion, or preparation do not constitute bona fide shipments to satisfy the 'transportation' alternative." Def. Reply Mem. at 7 (emphasis in original). Apple argues that the first proposition conclusively establishes that Articulate's demonstrations of Voice Navigator in March and April 1988 must have been an "open or public use before customers," thereby triggering the public use bar of 35 U.S.C. § 102(b). This argument will be considered in Section III.B below, in which the public use prong of the statute is considered. The significance that Apple attributes to the second McCarthy proposition is less clear. At most, it would appear that the second proposition establishes that Articulate must have known in 1988 that it was not entitled to register its trademark based on the transportation alternative.[11] This in turn might support an inference that Articulate in fact intended to base its 1988 application on the sale alternative, notwithstanding its present denial. The question under consideration, however, is not whether a factfinder *might* infer from the inherent incredibility of Articulate's present position that Voice Navigator was in fact being offered for sale as early as May 1988; it is whether such inference is inescapable. Again, in the face of Mimiça's explicit denial that pre-critical date sales or offers to sell were made, the answer is "no." Apple's reliance on Articulate's trademark application to support the granting of summary judgment based on the on-sale bar is therefore misplaced.

10. Articulate does not attempt to reconcile the first use date of May 31, 1988, with the fact that the demonstrations were all conducted—and the transportation must therefore have taken place—in March and April. Nor does it explain how the name "Voice Navigator" could have been used on goods transported as early as March and April 1988 for the purpose of conducting such demonstrations if, as Mimiça claims, the name "Voice Navigator" was not selected until May 1988. Mimiça Decl. at ¶¶ 7, 17. Apple does not address these apparent discrepancies, however, let alone argue that they establish its entitlement to summary judgment.

11. Even this much is unclear, however, since the demonstrations to prospective customers in March and April 1988 would not appear to have been a form of *"in-house* experimentation, evaluation, or preparation." McCARTHY, *supra* (emphasis supplied). Therefore, even if it is assumed that Articulate was familiar with and accepted the validity of McCarthy's formulation of the second proposition in 1988, it might still have believed—or at least hoped to persuade the PTO—that the proposition had no application to its own situation.

■ Finally, Apple relies upon articles in the trade press to support its motion for summary judgment based on the on-sale bar. The July 19, 1988 article in *MacWeek* concerning NASA's purported use of Voice Navigator has already been noted. Apple also cites an article which appeared in the Winter 1991 issue of a product catalog published by a vendor named Maya Computer. Def.Mem. at 7; Exhibit Index, Tab J. That article asserts, without any attribution or support, that Articulate began shipping Voice Navigator as early as 1986. The Maya article is almost certainly mistaken, since Articulate was not even formed until September 1986. In any event, the Maya article, like the article in *MacWeek,* is hearsay and may not be considered on a motion for summary judgment. FED.R.CIV.P. 56(e); *Scosche Indus.,* 121 F.3d at 680–81; *Finn* 782 F.2d at 16. Finally, even if the trade articles were considered, they would do nothing more than raise an issue of fact about Mimiça's claim that Voice Navigator was not sold, offered for sale, or shipped until October 1988. Mimiça Decl. at ¶¶ 13. Apple's reliance upon those articles, like its reliance upon the demonstrations and Articulate's trademark application, is therefore misplaced.

For all of the foregoing reasons, Apple is not entitled to summary judgment on the basis of the on-sale bar.

### B. Public Use

The question remains whether Apple is entitled to summary judgment on the theory that Voice Navigator was in public use prior to the critical date. Again, Apple relies primarily on evidence that Articulate demonstrated a prototype of Voice Navigator that embodied some of the claims of the '303 patent (including the only independent claim) to four prospective customers in the spring of 1988. To a lesser extent, it also relies on Articulate's trademark application, which asserts that the first use of the mark was in May 1988.

As noted, the evidence concerning what actually happened during the four demonstrations is sparse. Among other things, there is no evidence that Articulate's representatives ever relinquished control of the Voice Navigator prototype—even for a moment—to the persons to whom the product was demonstrated ("the disclosees"), and it is certainly clear that they did not leave the prototype with any of the disclosees. Nor is there any evidence that any disclosee was allowed to handle the prototype or request that it perform any particular task; that any of the tasks that were performed inured to the benefit of any disclosee; that any disclosee was charged anything for the privilege of attending the demonstration; or that any detailed explanation was given to any disclosee regarding how the prototype worked. On the other hand, there was direct evidence that each disclosee was required to agree to maintain confidentiality; that demonstrations were given to a total of only four disclosees; that no products were sold and no orders were taken or solicited during the demonstrations (or prior to the critical date);[12] and that the purpose of the demonstrations was to obtain input from potential users regarding additional features they would find desirable in a voice recognition software product.

Against this background, Apple claims that the demonstrations constituted "public use" within the meaning of 35 U.S.C. § 102(b).

As was the case with the on-sale bar, a person challenging a patent under the public use prong of section 102(b) bears a heavy burden of proving by clear and convincing evidence that a public use occurred more than one year before the application

---

12. As previously discussed, although Mimiça denies that orders were taken or solicited prior to the critical date, it is at least arguable, based on the interest in the product expressed by disclosees immediately following the demonstrations, that a factfinder could infer that solicitations were made.

for the patent was filed. *Tone Bros., Inc. v. Sysco Corp.*, 28 F.3d 1192, 1197 n. 4 (Fed.Cir.1994). Once the challenger has made out a prima facie case of public use, the burden of producing evidence to rebut that case (such as evidence that the use was "experimental") shifts to the inventor. The burden of persuasion remains at all times with the challenger. *Tone Bros.*, 28 F.3d at 1197 n. 4. If the inventor proffers evidence to counter the challenger's prima facie case, the court must decide as a matter of law whether, on the basis of the totality of the circumstances, the undisputed evidence establishes that there was a public use prior to the critical date. *Id.* at 1198. Of course, if evidence material to that decision is genuinely disputed, the disputed issue of fact must be resolved by a factfinder at trial before a legal conclusion can be reached.

■■■ Public use of an invention has been defined for purposes of Section 102(b) as "any use of that invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *In re Smith*, 714 F.2d 1127, 1134 (Fed.Cir.1983); *see also Egbert v. Lippmann*, 104 U.S. 333, 336, 26 L.Ed. 755 (1881) ("If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public use, even though the use and knowledge of the use may be confined to one person.") Other cases have emphasized the need to consider the totality of the circumstances in light of the various policies underlying the public use bar. *Tone Bros.*, 28 F.3d at 1199. Circumstances that have been deemed material include: the extent to which the inventor retained control over the invention and the dissemination of information concerning the invention during the period of its use, including whether a product embodying the invention was actually distributed to the public, *e.g., Lough v. Brunswick Corp.*, 86 F.3d 1113, 1120 (Fed.Cir.1996); whether the inventor secured a pledge of secrecy from the person to whom the invention was disclosed or before whom a product embodying the invention was used, *Smith*, 714 F.2d at 1137; the number of people to whom the invention or a product embodying the invention was disclosed, *id.*; whether, if the inventor is relying on a claim of experimental use, records were kept of the progress of the experiment, *Sinskey*, 982 F.2d at 499; whether the use of a product embodying the invention inured to the benefit of any member of the public, *Lough*, 86 F.3d at 1120, 1122; whether the product embodying the invention was still in the development stage, or whether, instead, the design of the product had been "set in stone," *Tone Bros.*, 28 F.3d at 1199; and whether the person to whom the invention was disclosed or for whose benefit a product embodying the invention was used was charged a fee, *Baker Oil Tools, Inc. v. Geo Vann, Inc.*, 828 F.2d 1558, 1564 (Fed.Cir.1987). Although none of the foregoing circumstances is dispositive, relinquishment of control by the patentee and the presence or absence of a secrecy agreement appear to carry the most weight. *Moleculon*, 793 F.2d at 1266; *TP Laboratories v. Professional Positioners, Inc.*, 724 F.2d 965, 972 (Fed.Cir.1984).[13]

■■■ Applying this checklist of factors to the case at bar, it cannot be said that the only conclusion that can be drawn from the evidence most favorable to Articulate

---

**13.** There also appears to be one species of case in which these factors hardly matter at all. That is where the inventor uses the invention under circumstances which preserve its secrecy, but the invention is used to produce product of commercial value that the inventor sells to the public. *Metallizing Eng'g, Co. v. Kenyon Bearing & Auto Parts Co.*, 153 F.2d 516, 518–20 (2d Cir.1946); *TP Labs.*, 724 F.2d at 972 ("Nor, it must be added, is all secret use *ipso facto* not 'public use' within the meaning of the statute, if the inventor is making commercial use of the invention under circumstances which preserve its secrecy.").

is that the demonstrations constituted public use. The evidence most favorable to Articulate suggests that it tightly controlled the demonstrations; it obtained a promise of secrecy from each disclosee; the demonstrations did not inure to the benefit of the disclosees; there were only four disclosees, and none of them was given a prototype for their use during or at the conclusion of the demonstration; none of them was charged a fee for the privilege of attending the demonstration; the product embodying the invention that became Claim 1 of the patent was in a very rudimentary and unmarketable stage; and, to the extent there was some intent on the part of Articulate to obtain information from the disclosees that would be helpful to a future marketing effort, Articulate was doing no more than exploring the market to determine what additional features potential users would find desirable in such a product.

From the standpoint of the policies underlying the public use bar, it certainly cannot be said that the four disclosees or that the public at large would mistakenly believe on the basis of those secret demonstrations that Voice Navigator was in the public domain. Nor is it clear that Articulate was taking advantage of those few, modest demonstrations to exploit its invention beyond the statutorily prescribed time. If Mimiça is to be believed, Articulate was simply exploring the market to determine what further development was required before Voice Navigator could be considered a marketable product. Taking into account the totality of these circumstances as measured against the policies underlying the public use bar, it cannot be said that the only rational conclusion a factfinder could reach based on the facts and inferences most favorable to Articulate was that the demonstrations, *per se*, constituted a public use.

■ This leaves for consideration Apple's last argument: that Articulate's application to register Voice Navigator for trademark protection is irrefutable proof of public use. Apple is mistaken. The open or public use that is required for trademark registration is not of the invention, *per se*, but of the mark itself. *See Preemption Devices v. Minnesota Mining and Mfg. Co.*, 732 F.2d 903, 906 (Fed.Cir. 1984) ("We find particularly unconvincing [appellant's] argument based on the declaration filed in connection with the application to register the trademark OPTICOM, stating the dates of first use and first use in commerce. Those statements were not made with respect to the use of the invention but the use of the mark.")

For all the foregoing reasons, Apple is not entitled to summary judgment on the basis of the public use bar.

## IV. Conclusion

For all of the reasons stated above in Part III, I recommend that Apple's motion for summary judgment that the '303 patent is invalid under 35 U.S.C. § 102(b) be DENIED.

## V. IMPORTANT NOTICE OF RIGHT TO OBJECT AND WAIVER OF RIGHT TO APPEAL FOR FAILURE TO DO SO WITHIN TEN DAYS

The parties are hereby advised that under the provisions of Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court WITHIN 10 DAYS of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has indicated that failure to comply with this rule shall preclude further appellate review by the Court of Appeals of the District Court's order entered pursuant to

this Report and Recommendation. *See United States v. Valencia–Copete,* 792 F.2d 4, 5–6 (1st Cir.1986); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *United States v. Vega,* 678 F.2d 376, 379 (1st Cir.1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 605 (1st Cir.1980); *see also Thomas v. Arn,* 474 U.S. 140, 148–149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986).

April 16, 1999.