**MASSACHUSETTS INSTITUTE OF TECHNOLOGY, Plaintiff,**

v.

**HARMAN INTERNATIONAL INDUSTRIES, INC., Defendant.**

**Civil Action No. 05–10990–DPW.**

United States District Court, D. Massachusetts.

Sept. 9, 2008.

Kimberly Ann Mottley, Steven M. Bauer, Jacob K. Baron, John W. Pint, Proskauer Rose, LLP, Boston, MA, for Plaintiff.

Colleen M. Garlington, Craig D. Leavell, Michelle A.H. Francis, William A. Streff, Jr., Kirkland & Ellis LLP, Chicago, IL, Edward S. Cheng, James W. Matthews, Robert J. Muldoon, Jr., Courtney Amber Clark, Sherin and Lodgen LLP, Boston, MA, for Defendant.

## MEMORANDUM

DOUGLAS P. WOODLOCK, District Judge.

The Massachusetts Institute of Technology ("MIT") filed this action against Harman International Industries Inc. ("Harman") for patent infringement of U.S. Patent No. 5,177,685 ("'685 patent"). The '685 patent is an automobile navigation system using spoken word directions, entitled "Automobile Navigation System Using Real Time Spoken Driving Instructions." The '685 patent is also known as "Back Seat Driver Patent," and is part of a project that MIT graduate student Jim Davis ("Davis") developed at the MIT Media Laboratory ("Media Lab") with his faculty advisor Chris Schmandt ("Schmandt") when writing and defending his doctoral thesis called "Back Seat Driver." Harman has filed a motion for summary judgment contending that '685 patent claims 1, 42 and 45 are invalid under the "public use" bar of 35 U.S.C. § 102(b) because the invention was allegedly in public use on the critical date, more than one year before patent application was filed. MIT has filed a cross-motion contending the invention was not in public use before the critical date and also seeking to establish that claims 1, 42 and 45 of '685 patent are not invalid under the § 102(b) "printed publication" bar.[1]

---

1. In a variation of the "public use" and "printed publication" questions, Harman had previously filed a motion for summary judgment on the issue that patent '865 is unen- forceable because MIT acted inequitably in misrepresenting and withholding information when submitting its patent application regarding the purported printed publication

Magistrate Judge Judith G. Dein has issued a Report and Recommendation ("R & R") in support of the grant to defendant Harman of summary judgment on the issue that the '685 patent is invalid under the "public use" bar of 35 U.S.C. § 102(b).[2] In addition, Magistrate Judge Dein recommended the grant of summary judgment to plaintiff MIT on the issue that claims 1, 42 and 45 of '685 patent are not invalid under the § 102(b) "printed publication" bar. *Id.* Both parties submitted independent *de novo* review memoranda contesting aspects of these recommendations. Following that review, I have determined to deny summary judgment to both parties on the public use bar issue and to grant the MIT motion for summary judgment on the printed publication issue, for reasons explained more fully below.

## I. Factual Background

### A. Back Seat Driver project

Both Harman and MIT generally agree that Magistrate Judge Dein's summary of the facts is accurate, with minor disputes that I will note as relevant below. I will also add reference to certain facts regarding experimentation, which the Magistrate Judge did not include in the factual narrative of the R & R.

Plaintiff MIT applied for the '685 patent on August 9, 1990, and received it on January 5, 1993. Davis and Schmandt are named inventors on the '685 patent and MIT is the assignee. The "critical date" for purposes of the public use bar § 102(b) summary judgment motion is August 9, 1989, one year before the day MIT filed the '685 patent application.

Claim 1 of the '685 patent is:

An automation navigation system which produces spoken instructions to direct a driver of an automobile to a destination in real time comprising [of]:

■ computing apparatus for running and coordinating system processes,

■ driver input means functionally connected to said computing apparatus for entering data into said computing apparatus, said data including a desired destination,

■ a map database functionally connected to said computing apparatus which distinguishes between physical and legal connectivity,

■ positioning sensing apparatus installed in the automobile and functionally connected to the said computing apparatus for determining the automobile's current position,

■ a location system functionally connected to the said computing apparatus for accepting data from the said position sensing apparatus, for consulting said map database, and for determining the automobile's current position relative to the map database,

■ a route-finder functionally connected to the said computing apparatus, for accepting the desired destination from said driver input means and the current position from said location system, for consulting said map database, and for computing the route to the destination,

■ a discourse generator functionally connected to said computing apparatus for accepting the current position form the said location system and the route from the route finder, for consulting said map database, and for composing dis-

---

and public use circumstances also at issue in the instant motion. The Magistrate Judge recommended denial of the earlier motion and I adopted that recommendation.

2. Accordingly, Magistrate Judge Dein recommended that this Court deny the MIT cross-motion for summary judgment that '685 patent claims 1, 42 and 45 are valid because the field trials did not amount to public use.

course including instructions and other messages for directing the driver to the destination from the current position, ■ a speech generator functionally connected to said discourse generator for generating speech from the said discourse provided by the discourse generator, and

■ voice apparatus functionally connected to said speech generator for communicating said speech provided by the said speech generator and said driver. Claim 42 of the '685 patent is:

The automobile navigation system of claim 1 wherein each intersection in a route is classified into one type in a taxonomy of intersecting types, and the disclosure generated in relation to each intersection depends on the type.

Claim 45 of the '685 patent is:

The automobile navigation system in claim 1 wherein each discourse generated comprises a long description of an act given substantially before the act is to be performed and a short description given at the time the act is to be performed.

From 1988 to 1989, in efforts to receive sponsorship, MIT provided general information to various companies regarding several of its Media Lab projects, including the Back Seat Driver project. MIT encouraged Media Lab sponsors to "leverage" Media Lab resources and to use the Lab "as a window" to investments, startups and potential opportunities. MIT authorized sponsors to "visit, view and discuss hundreds of working prototypes developed by the Lab," and gave them access to a sponsor-only website where they could view certain technical notes on research projects. NEC Electric ("NEC") became the corporate sponsor for the Back Seat Driver project, providing at least $400,000 in funding, and eventually also became the licensee of the technology.

Davis and Schmandt (the "researchers" or "inventors") began conducting field trials of the Back Seat Driver in April 1989. They installed a prototype version of the Back Seat Driver system in a 1988 Acura Legend and used this technology during these field trials. During the field trials, various drivers operated the vehicle and one of the researchers sat beside them. Either Davis or Schmandt was in the car at all times while the drivers operated the vehicle using the Back Seat Driver system, and thus the researchers maintained control over who used the technology at all times during the trials. The researchers never showed the drivers how the technology worked, aside from what the drivers themselves observed from using the technology.

By June 1989 the researchers were sure the Back Seat Driver would work, but continued testing to " 'ensure that the system was safe, effective, durable, and repeatable.' " They conducted at least fifty trials prior to the critical date of August 9, 1989. The researchers used only one car to conduct all the trials and parked the car in an MIT garage that required card access. MIT owned the car and the equipment prior to and for some time after the critical date. Drivers received no compensation for their participation and they lacked an expectation that the Back Seat Driver device would be available to them for personal use after testing.

Version 2 of the invention was used during the field trials, where a portion of the Back Seat Driver equipment was located in the car, the rest was at the Media Lab, and researchers used cellular phones to relay signals between the two locations. Members of the public observing the car from outside were unable to see any components of the Back Seat Driver System. Davis and Schmandt reported that Version

2 was working well, that they were able to make dozens of successful trips, and that they had a good idea of the features they should choose to include in the instructions. Version 2, nevertheless, still had problems with communication between the equipment in the car and the Media Lab and the inventors took steps to remedy them. Either shortly before or shortly after the critical date, the researchers developed and implemented Version 3 of the invention, where the entire system was installed in the car. They did this to make a "more reliable, cheaper, and a much more convincing 'concept car.'"

■ The parties disagree about whether claims 1, 42 and 45 of the '685 patent were included in Version 2 of the Back Seat Driver and thus whether these claims were part of all fifty field trials. Magistrate Judge Dein concluded, based on the evidence adduced on this issue, and I agree, that in fact claims 1, 42 and 45 of the '685 patent were embodied in Version 2 and accordingly were part of all of the field trials. She also found as a matter of law that these claims were "reduced to practice" prior to the critical date,[3] but that there was no evidence that MIT commercially exploited the invention. Neither party challenges these conclusions.

MIT contends, and I agree, that the researchers needed to experiment[4] with the invention using "field trials occurring on public streets that formed part of the digitalized map." On July 31, 1989, the prototype version of the Back Seat Driver was having a "loss of carrier problem," where the data transmission was functioning improperly and resulted in dropped calls. The inventors hired an undergraduate student, Gregory Grove ("Grove"), to work on the Back Seat Driver project and the loss of carrier signal problem. Grove, however, never drove the prototype.

In Summer of 1989 and into 1990, Davis continued to test the strength and durability of the voice and data communication channels. These problems were not completely solved until after the critical date.

Schmandt testified that although there is no record of any changes in the Back Seat Driver system between June and July of 1989, it is very likely that Davis made modifications because "the purposes of these test drives was to debug and evaluate his software." Davis continued to modify the source codes for the Back Seat Driver up until the day of filing of the '685 patent application. The inventors changed the Back Seat Driver system, including the "discourse generator," in response to the field trials that occurred in Summer 1989. The Back Seat Driver was not perfected until after Davis's thesis was finalized and the on-board computer was used.

### B. Confidentiality

None of the drivers who participated in the field trials of the Version 2 prototype signed confidentiality agreements. Indeed, MIT has been unable to identify the test drivers specifically. Nevertheless, MIT challenges Magistrate Judge Dein's finding that MIT researchers lacked an implied confidentiality agreement with the drivers of the car during field trials.

---

**3.** An invention is reduced to practice when the inventor (a) constructed an embodiment that met the limitations of the invention and (b) determined the invention works for the purpose intended. *Taskett v. Dentlinger,* 344 F.3d 1337, 1340 (Fed.Cir.2003) (citing *Cooper v. Goldfarb,* 154 F.3d 1321, 1327 (Fed. Cir. 1998)).

**4.** Harman objects to MIT's use of the term "'experimentation' as a legal conclusion," stating that there can be no more experimentation after an invention has been reduced to practice. I will address this argument in Section III below.

Reading the record in a light most favorable to MIT, Magistrate Judge Dein found the researchers probably had to get permission from the MIT Committee on the Use of Humans as Experimental Subjects ("Committee") in order to use the drivers during the field trials, but that the Committee's concern in granting such permission dealt exclusively with safety of the research subjects and failed to address any confidentiality issues. The Committee also required that the researchers ride along in the car. Davis stated that either he or Schmandt rode along in the car at all times during the field trials, in conformance with their protocol, so as to observe and monitor the performance of the drivers. Various individuals drove the car, including MIT students, members of Davis's thesis committee, NEC employees and a Bellcore employee.[5]

MIT claimed that all field trial participants were trusted friends, supporters or colleagues of either the researchers or Media Lab, and that they understood the implied duty not to disclose information regarding the Back Seat Driver project. However, MIT adduces no evidence to support this conclusion. Magistrate Judge Dein found, and I agree, that the record supports a finding that "MIT took no steps to limit the dissemination of information gathered during field trials," and that it failed to support the notion that there is a "recognized culture that would preclude, or at least inhibit, most of the participants in the field tests from disclosing information about the Back Seat Driver program to others." No record evidence shows either that the researchers gave any instructions to keep any information that drivers gathered while using the Back Seat Driver system confidential or that the researchers

expected the drivers to keep such information confidential.

Davis stated in his affidavit that "the drivers were generally not shown how the Back Seat Driver worked" and their "exposure to the system was limited to entering a destination and driving the car according to the supplied directions." Davis failed, however, to address the confidentiality issue in his affidavit.

MIT had a general written policy of "Open Research and Free Interchange of Information" at the time the Back Seat Driver project took place, which stated that "open research and free interchange of information among scholars [is] essential to [the "encouragement of research and inquiry into intellectual areas of great promise,"] and to the interests of the nation as a whole," and generally encouraged the openness of research among scholars. Media Lab also had a written policy which stated that Media Lab is "an intellectually open environment where ideas are readily exchanged and a community wherein each sponsor is entitled to acquire non-exclusive license rights to all intellectual property that is conceived, reduced to practice or developed at the Laboratory during the period of sponsorship." The Media Lab policy further stated that certain materials "contained in reports, prototypes, demonstrations, and other research results made available to the sponsors" would be marked as "Confidential" in order "to preserve patentability," that information that sponsors receive in such reports should be kept strictly confidential, and should be returned to the lab if the recipients do not desire to do so. The Magistrate Judge stated, and I agree, that no evidence exists

---

**5.** Magistrate Judge Dein also found that General Motors ("GM") personnel participated in some field trials. MIT disputes this finding at least insofar as it suggests participation in

field trials before the critical date. I do not consider this finding to alter the factual background for purposes of evaluating either Harman's motion or MIT's cross-motion.

demonstrating that these policies applied specifically to the Back Seat Driver project.

The researchers authored a paper regarding the Back Seat Driver project entitled "Synthetic Speech for Real Time Direction–Giving." In the article, they provided an overview of the system and described its components. The references noted the work was still in progress, stated that they were conducting field trials, described various aspects of the research prototype vehicle that they used for field trials,[6] and presented and made the document available without restriction at an Illinois International Conference on Consumer Electronics in June 1989. The newspaper *Automotive Electronic News* published an article entitled "Prototype Guidance Unit Uses Speech Synthesis" that essentially described the Back Seat Driver project in the same manner, also stating that "the next step" in developing the project would be to figure out exactly what the voice guidance speech would say, how time and speed would affect it, and what features the data map had to contain.

MIT provided NEC, the corporate sponsor for the Back Seat Driving project, with information regarding the project and held regular quarterly meetings during which MIT showed NEC everything they had on the Back Seat Driver project, including the latest system and software. An NEC representative, Philip Rittmueller, rode in the prototype car two or three times. NEC and MIT did not have a confidentiality agreement, and Mr. Rittmueller did not understand that he was obligated to keep information regarding the project confidential, even though it may have been of interest to NEC to do so.

MIT also shared information regarding the project with Bellcore, another corporate sponsor of the Back Seat Driver project, including Dr. Lynn Streeter, a Bellcore researcher, and Michael Lesk, a member of the thesis committee for Davis and a Bellcore employee. Bellcore usually shared reports they received from the Media Lab with members of their computer science division. Dr. Streeter testified that the reports "are public domain" and that Bellcore "would pass them around to people who were interested." The record lacks any evidence that Bellcore and MIT had a confidentiality agreement.

## C. Back Seat Driver Thesis availability

The thesis Davis wrote on the Back Seat Driver project was signed on August 4, 1989. On February 27, 1990, MIT turned the thesis over to the MIT library for public dissemination. MIT applied for the '685 patent on August 9, 1990. The PTO initially rejected the '685 patent application because of the August 4, 1989 signature date on Davis's thesis, which it believed created the possibility the thesis had been publically available at that time. MIT thereafter submitted the library copy of the thesis to the PTO and explained that the thesis had only become publically available after the library publication date of February 27, 1990. The PTO granted the '685 patent application on January 5, 1993.

The only electronic copies of the thesis that Davis and Schmandt stored were on a password-protected computer in the Medial Lab, located in a room that required keypad access to enter. Davis and Schmandt were the only people who knew the password, the only ones who could

---

6. The researchers described the Version 2 system, explaining that the cellular phone transmissions linked the equipment in the car and

in the laboratory together, and described the manner in which the signals are transmitted.

access the thesis on the computer, and thus they were able to control the availability of the document to others. Except as explained below, only members of Davis's thesis committee or colleagues who were acting in an academic advisory capacity received copies of the thesis prior to its publication in the MIT library.

Mr. Rittmueller from NEC; Dr. Streeter, a Bellcore researcher; and Mr. Lesk, a Bellcore employee and a member of Davis's thesis committee, each received a copy of the Back Seat Driver project thesis before MIT applied for the '685 patent.

MIT and Harman disagree about whether Mr. Rittmueller received the completed thesis before the critical date of August 9, 1989. MIT contends that Mr. Rittmueller received the thesis after it became available in the MIT library on February 27, 1990, while Harman contends that he received it on or around July 31, 1989, when Davis and Schmandt issued the "Back Seat Driver 4th Quarterly Report." MIT presents the depositions of Mr. Rittmueller, who states that he did not receive a copy of the July 31 report on that date and that he does not know exactly when he did receive it. Magistrate Judge Dein noted the fact that Davis only signed the thesis a few days before the critical date; she concluded, and I agree, that there is insufficient evidence to establish that Mr. Rittmueller received the thesis prior to the critical date.

The record is unclear as to whether Dr. Streeter received a copy of Davis's thesis prior to the critical date. Dr. Streeter testified that she received the thesis either "about the same time it was published" or when Davis defended the thesis. The parties disagree about when Davis defended his thesis, although there is evidence to show that he defended it after the critical

date. This point is addressed more fully below.

The parties also dispute the level of confidentiality which Mr. Rittmueller and Dr. Streeter believed they should accord the thesis. The copies of the thesis they received were not marked "confidential." The Magistrate Judge found some evidence that Dr. Streeter sent a copy of the thesis to Karen Lochbaum, of Aiken Corporations, and to a Harvard graduate student. Nothing suggests that Ms. Lochbaum had a relationship with MIT. Dr. Streeter testified that if she had sent a thesis to Ms. Lochbaum, she would have only done so after it was "publically available." Dr. Streeter also testified that she understood that in an academic environment a thesis is sometimes circulated among small groups of people for suggestions and comments but that it is not to be published without the agreement of the author or researcher. Schmandt testified that the general MIT policy "without exceptions" is that thesis drafts are not public and are not to be publically distributed.

A University of Minnesota graduate student emailed Davis in May 1989 and asked about information regarding the Back Seat Driver project. Davis denies that anyone sent the thesis to the student, and while his reply is not in the record, the student wrote back to Davis "I think I can wait a couple of weeks to see your thesis."

The parties dispute whether Davis defended his thesis prior to the critical date. Harman relies exclusively on a flyer, the record copy of which contains handwritten corrections and typos, and which states that Davis will defend his thesis on May 26, 1989. MIT cites the testimony of Davis and Schmandt stating that this flyer is a draft, that Davis was unprepared to defend the thesis on that date, and that

Davis defended the thesis in late Summer or Fall of 1989.

## II. Legal Standards

### A. Patent Validity

■ The Patent Act presumes patent validity and places the burden on the party challenging that validity to show by clear and convincing evidence that the patent is invalid. 35 U.S.C. 282 (1994); *Mas–Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1216 (Fed.Cir.1998) (citing *Innovative Scuba Concepts, Inc. v. Feder Indus., Inc.*, 26 F.3d 1112, 1115 (Fed.Cir.1994)); *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1376 (Fed.Cir.1986); *Articulate Sys., Inc. v. Apple Computer, Inc.*, 53 F.Supp.2d 62, 64 (D.Mass.1999). Once the challenging party has offered this *prima facia* case of invalidity, the party supporting validation has the burden to present contrary evidence, but the ultimate burden of persuasion remains on the challenging party. *Mas–Hamilton Group*, 156 F.3d at 1216. The validity of a patent is a question of law based on the underlying facts. *See, e.g., Netscape Commun. Corp. v. Konrad*, 295 F.3d 1315, 1320 (Fed. Cir.2002); *SRI Int'l, Inc. v. Internet Sec. Sys., Inc.*, 511 F.3d 1186, 1192 (Fed.Cir. 2008).

### B. Summary Judgment

To grant summary judgment, this Court must find that the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) (2007). A "genuine factual issue" is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Triangle Trading Co., Inc. v. Robroy Indus.*, 200 F.3d 1, 2 (1st Cir.1999). A jury must ultimately resolve any issues of material fact and "the judge's function is not himself to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. The Court, however, must "view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254, 106 S.Ct. 2505. Therefore, where a "clear and convincing evidence" standard applies, the Court's inquiry "as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255, 106 S.Ct. 2505.[7] In conducting

---

**7.** I note that obscured in the chromatic metaphors deployed by the Supreme Court in *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), to describe the quantum of evidence to support summary judgment—more than "merely colorable," *id.* at 249, 106 S.Ct. 2505, as "presented through the prism of the substantive evidentiary burden," *id.* at 254, 106 S.Ct. 2505—are daunting and insufficiently illuminated questions for the trial judge considering summary judgment motions that turn on a clear and convincing evidentiary burden. Nothing in the past two decades has given reason to recede from the Supreme Court's earlier observations that "the ultimate truth as to how the standards of proof affect decision-making may well be unknowable," and that "[w]e probably can assume no more than that the

difference between a preponderance of the evidence and proof beyond a reasonable doubt is better understood than either of them in relation to the intermediate standard of clear and convincing evidence." *Addington v. Texas*, 441 U.S. 418, 424–25, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979).

In a survey of his colleagues on the United States District Court for the Eastern District of New York, Judge Weinstein found that the probabilities assigned to clear and convincing evidence ranged from 60% to 75%. *United States v. Fatico*, 458 F.Supp. 388, 410 (E.D.N.Y.1978). Professor Potter, referencing more recent efforts to quantify evidentiary standards, states that "[i]t seems pretty obvious to me that 'clear and convincing' clocks in at about 65%, give or take a point or two."

this inquiry, the Court must draw all "justifiable inferences" in favor of the nonmoving party. *Id.* at 255, 106 S.Ct. 2505 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)); *see also Wynne v. Tufts University School of Medicine,* 976 F.2d 791, 794 (1st Cir.1992).

If the moving party does not have the trial burden of production, it may satisfy its initial summary judgment burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmoving party to produce specific facts that show at a minimum that a genuine issue of material fact exists regarding the elements of its case. *Barbour v. Dynamics Research Corp.,* 63 F.3d 32, 36–37 (1st Cir. 1995) (citing *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505); *Wynne,* 976 F.2d at 794 (quoting *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir.1991), *cert. denied,* 504 U.S. 985, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992)) (stating that "[t]his requirement has sharp teeth" because "[the nonmoving party] 'must present definite, competent evidence to rebut the motion' ").

The Court must grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. The Court may grant a summary judgment motion if the nonmoving party's evidence is "merely colorable" and "not significantly probative." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. The same basic analysis applies in what must be the separate evaluation of cross-motions for summary judgment. *Adria Int'l Group, Inc. v. Ferre Dev., Inc.,* 241 F.3d 103, 107 (1st Cir.2001) (Lipez, J.).

In considering the cross-motions for summary judgment on the public use issue, I draw all justifiable inferences based on the evidence of record in favor of the non-moving parties to the respective motions. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505 (citing *Adickes,* 398 U.S. at 158–59, 90 S.Ct. 1598); *Wynne,* 976 F.2d at 794. Of course, the '685 patent is presumed valid and Harman, in order to prevail on its summary judgment motion, has the burden of overcoming that presumption and demonstrating that no reasonable fact finder could fail to find by clear and

Parker B. Potter, Jr., *Substantial Evidence,* 11 Green Bag 2d 415, 416 (2008). Recognizing that the illusory specificity of probability percentages is no more helpful than narrative descriptions of the evidentiary standard in this context, at the hearing on these motions, I solicited the assistance of the parties in obtaining insight regarding the actual role of a trial judge addressing summary judgment motions turning on a clear and convincing standard. This solicitation yielded no additional insight but rather left me with the firm belief that the standard is, as then-Justice Rehnquist observed in his *Anderson* dissent, "vague and impressionistic." 477 U.S. at 272, 106 S.Ct. 2505.

Resigned to the uncertainties created by the obligation to apply the "abstractions" of the clear and convincing evidentiary standard, *id.*

at 269, 106 S.Ct. 2505 (Rehnquist J., dissenting), without myself actually weighing the evidence, I have "struggle[d]," *id.* at 268, 106 S.Ct. 2505 (Brennan, J. dissenting), as the majority opinion in *Anderson* directs, to conduct an "inquiry as to whether a genuine issue exists [regarding] whether the evidence presented is such that a jury applying that standard could reasonably find for either the plaintiff or the defendant." *Id.* at 255, 106 S.Ct. 2505. In making that inquiry, I add one further coda to the *Anderson* directive by noting that the measure is not whether an entire and presumptively unanimous "jury" of from six to twelve members, Fed.R.Civ.P. 48, could find for the non-moving party, but rather whether one such fact finder could find for that party so long as that individual juror is acting reasonably.

convincing evidence that the patent is invalid. 35 U.S.C. 282 (1994); *Mas–Hamilton Group*, 156 F.3d at 1216; *Articulate Sys.*, 53 F.Supp.2d at 64 (citing *Innovative Scuba Concepts, Inc.*, 26 F.3d at 1115); *Hybritech Inc.*, 802 F.2d at 1376. For its part, MIT, in order to prevail on its motion for summary judgment, must demonstrate that no reasonable fact finder could find the patent invalid on the basis of the § 102(b) bar.

### III. Public Use Bar

■■■■ A patent for a particular invention will be held invalid if the "invention was … in public use … in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. 102(b) (2000); *see, e.g., Am. Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1267 (Fed.Cir.2008). The § 102(b) public use bar applies when the invention is (1) "in public use," which is demonstrated by showing either that the purported use was (a) "accessible to the public" or (b) "commercially exploited," and (2) "ready for patenting," which can be demonstrated by proving that (a) the invention was reduced to practice, or (b) "the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention" before the critical date. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1379–80 (Fed.Cir.2005) (citing *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67–68, 119 S.Ct. 304, 142 L.Ed.2d 261 (1998)). As a general matter, an invention is in public use if "a person other than the inventor, who is under no limitation, restriction, or obligation of secrecy to the inventor" uses the invention. *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.*, 386 F.3d 1371, 1379 (Fed.Cir.2004) (citing *Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed.Cir.2002)); *see also In re Smith*,

714 F.2d 1127, 1134 (Fed.Cir.1983). In determining whether the use was "public" under § 102(b), a court must further consider: (1) "evidence relevant to experimentation," (2) "the nature of the activity that occurred in public," (3) "public access to the use," (4) "confidentiality obligations imposed on members of the public who observed the use," and (5) "commercial exploitation." *Invitrogen Corp.*, 424 F.3d at 1380. In addition to these five factors, the court must also consider the policy considerations underlying the public use bar. *See Eli Lilly v. Zenith Goldline*, 471 F.3d 1369, 1380 (Fed.Cir.2006).

■■■■ First, evidence of experimentation is a relevant public use factor both before and after an invention is reduced to practice. *See Atlanta Attachment Co. v. Leggett & Platt, Inc.*, 516 F.3d 1361, 1368–69 (Fed.Cir.2008) (Prost, J. concurring). Before an invention is reduced to practice, proof that a particular public use was experimental and necessary to test the invention negates the application of the § 102(b) public use bar. *Pfaff*, 525 U.S. at 64, 119 S.Ct. 304; *EZ Dock, Inc. v. Schafer Systems, Inc.*, 276 F.3d 1347, 1352 (Fed.Cir.2002); *TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 971–72 (Fed.Cir.1984); *Netscape Communications Corp.*, 295 F.3d at 1320. This is the so-called "experimental use doctrine." *Pfaff*, 525 U.S. at 64, 119 S.Ct. 304. After an invention has been reduced to practice, however, proof of experimentation is no longer sufficient of itself to negate the public use bar. *See New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.*, 298 F.3d 1290, 1297 (Fed.Cir.2002) (citing *RCA Corp. v. Data Gen. Corp.*, 887 F.2d 1056, 1061 (Fed.Cir.1989)), *cert. denied*, 537 U.S. 1232, 123 S.Ct. 1357, 155 L.Ed.2d 196 (2003) ("Once an inventor realizes that the invention as later claimed indeed works for its intended purpose, further 'experimentation' may

constitute a barring public use."); *EZ Dock, Inc.*, 276 F.3d at 1357 (Linn, J., concurring) ("[O]nce the invention is reduced to practice, there can be no experimental use negation"); *Continental Plastic v. Owens Brockway Plastic*, 141 F.3d 1073, 1079 (Fed.Cir.1998) (citing *Atlantic Thermoplastics Co. v. Faytex Corp.*, 5 F.3d 1477, 1480 (Fed.Cir.1993)); *Baxter Int'l, Inc. v. Cobe Lab., Inc.*, 88 F.3d 1054, 1060 (Fed.Cir.1996); *see also Pfaff*, 525 U.S. at 66 n. 12, 119 S.Ct. 304 (explaining that Supreme Court decisions holding that an invention is incomplete until it is reduced to practice "are best understood as indicating that the invention's reduction to practice demonstrated that the concept was no longer in the experimental phase"). Nevertheless, evidence showing that the use in question was experimental remains relevant because it helps the court determine the precise nature of the use.[8] *Atlanta Attachment Co.*, 516 F.3d at 1368–69 (Prost J., concurring).

 Second, the nature of the public activity is also a relevant factor. Public use of an invention must be "ordinary use" or use as the invention was intended. *Invitrogen Corp.*, 424 F.3d at 1382 (quoting *Electric Storage Battery Co. v. Shimadzu*, 307 U.S. 5, 20, 59 S.Ct. 675, 83 L.Ed. 1071 (1939)). Because "some inventions are by their very character only capable of being used where they cannot be seen or observed by the public eye," the fact that all parts of a given invention are not in plain view of its users will not negate an otherwise public use. Similarly, "whether the use of an invention is public or private does not necessarily depend upon the number of persons to whom its use is known." *Egbert v. Lippmann*, 104 U.S. 333, 336, 26 L.Ed. 755 (1881).

 Third, public access to the use is also an important "public use" consideration. For example, the inventor's relinquishment of control of the invention after reduction to practice can help distinguish between the inventor's personal use of an invention in the public eye and "public use" of the invention. *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1266 (Fed.Cir.1986) (holding that the inventor of Rubik's Cube did not publicly use his invention because he controlled the use at all times).

 Fourth, confidentiality obligations must also be considered. The confidentiality of an invention is not *ipso facto* determinative on the public use issue. *TP Labs., Inc. v. Prof'l Positioners, Inc.*, 724 F.2d 965, 972 (Fed.Cir.1984). Nevertheless, obligations of secrecy become increasingly important for demonstrations of an invention once it has been reduced to practice. *Baxter Int'l, Inc.*, 88 F.3d at 1059–60 (holding that demonstrations of a centrifuge after it has been reduced to practice in a laboratory with a free flow of people who lacked any duty of confidentiality is public use of the invention); *Beachcombers v. WildeWood Creative Products, Inc.*, 31 F.3d 1154, 1160 (Fed.Cir.1994) (holding that a demonstration of a working invention in front of twenty to thirty guests at a house party, all of whom lacked an obligation of secrecy regarding the invention, constituted public use); *see also System Mgmt. Arts v. Avesta Techs.*, 87 F.Supp.2d 258, 268 (S.D.N.Y.2000) (and cases cited).

Fifth, the court must consider the extent to which the use in question involved commercial exploitation by the inventors. If, for example, an inventor offered samples of his invention for sale before the critical

---

8. In this respect, evidence that the use was experimental after an invention has been reduced to practice overlaps with the broader second factor identified in *Invitrogen Corp:* "the nature of the activity that occurred in public." 424 F.3d at 1380.

date, the public use bar would apply. *See D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1147 (Fed.Cir.1983).

 Lastly, the policy considerations underlying the public use bar must be part of the determination of public use. *See, e.g., Eli Lilly v. Zenith Goldline,* 471 F.3d at 1380. The statutory bar provided by § 102 exists in order to "discourag[e] the removal of inventions from the public domain which the public justifiably comes to believe are freely available, prohibit[ ] an extension of the period for exploiting the invention, and favor[ ] prompt and widespread disclosure of inventions." *Bernhardt, L.L.C.,* 386 F.3d at 1379 (quoting *Manville Sales Corp. v. Paramount Sys., Inc.,* 917 F.2d 544, 550 (Fed.Cir.1990)); *see also Pfaff,* 525 U.S. at 64, 119 S.Ct. 304.

In order to find that claims 1, 42 and 45 of the '685 patent are invalid, I must determine that at least one of the field trials that the inventors conducted prior to the critical date constituted public use. Since the Back Seat Driver was ready for patenting prior to the critical date because it had already been reduced to practice, the determinative issue for purposes of this summary judgment motion is whether the use of the invention was "public use" under the first prong of the test for § 102(b). *See Pfaff,* 525 U.S. at 67–68, 119 S.Ct. 304; *Invitrogen Corp.,* 424 F.3d at 1379–80. As discussed in greater detail above, relevant considerations for determining whether the use was "public" under the statute include: (1) evidence of experimentation, as it reflects upon, (2) the nature of the activity that occurred in public; (3) public access to use of the prototype car; (4) confidentiality agreements between the drivers of the prototype car and MIT; and (5) commercial exploitation. *See Invitro-*

*gen Corp.,* 424 F.3d at 1380. I must also consider the policies underlying the public use bar. *See Eli Lilly,* 471 F.3d at 1380.

## A. Evidence of Experimentation

The evidence that the field trials were experimental in nature weighs against holding that the '685 patent was in public use. Harman does not dispute MIT's evidence that the researchers were conducting experiments of various features of the Back Seat Driver when performing field trials prior to the critical date. Harman instead relies on its interpretation of the "experimental use" doctrine, arguing that evidence of experimentation is irrelevant after an invention has already been reduced to practice. Magistrate Judge Dein accepted Harman's interpretation and disregarded evidence that MIT's use of the Back Seat Driver prototype was experimental in nature. I view this approach as unduly restrictive.

 Evidence that the researchers were still conducting experiments of the Back Seat Driver prototype is relevant in determining the precise nature of the activity that occurred in public.[9] It is true that the "experimental use" doctrine cannot wholly negate the § 102(b) public use bar because claims 1, 42 and 45 of the '685 patent had been reduced to practice before the critical date. *See, e.g., New Railhead Mfg.,* 298 F.3d at 1297; *Baxter Int'l, Inc.,* 88 F.3d at 1060. Once an invention has been reduced to practice, further experimentation cannot be justified on the grounds that it is necessary to establish that the invention works for its intended purpose—i.e., that it is patentable at all. *Id.* at 1297. The evidence that Davis was still experimenting and making alterations to the prototype during the field trials,

---

9. As noted above, Note 8, *supra,* this evidence effectively overlaps with the second factor identified in *Invitrogen:* "the nature of the activity that occurred in public." 424 F.3d at 1380.

however, remains relevant to the extent that it shows the field trials were not "public" within the meaning of § 102(b). *See Atlanta Attachment Co.*, 516 F.3d at 1368–69 (Prost, J. concurring); *Invitrogen Corp.*, 424 F.3d at 1380; *see also TP Laboratories v. Professional Positioners, Inc.*, 724 F.2d at 971 (holding that experimental use is not a separate inquiry, but rather bears directly on whether a particular use was "public use" under § 102(b)). Even after reduction to practice, evidence of experimental use can show that the public's access to the invention was limited. As Judge Prost observed in *Atlanta Attachment Co.*, "experimental use in this respect represents the counterpoint to commercial sale or public use." [10] 516 F.3d at 1369 (Prost, J. concurring). This interpretation is consistent with one of the primary purposes of the § 102(b) "public use" bar: preventing the removal of inventions from the public domain after the inventions have been used in such a way that "the public justifiably comes to believe [they] are freely available." *Bernhardt*, 386 F.3d at 1379. When an invention's use is clearly experimental in nature, the public is less likely to have any justifiable belief that the invention is "freely available." *See Elizabeth v. Am. Nicholson Pavement Co.*, 97 U.S. 126, 134, 24 L.Ed. 1000 (1878) ("The use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as [public] use.").

▆ MIT presents essentially undisputed evidence that the field trials were openly experimental in nature. For example, the MIT researchers had to get Committee approval to use the drivers as test subjects during the field trials. Davis con-

tinued to make modification of the Back Seat Driver, including modifications of source codes and the "discourse generator," based on data he gathered during field trials. Schmandt testified that "the purposes of these test drives was to debug and evaluate [Davis's] software." Version 2, which was used in the field trials, was not the final version of the invention and in fact Version 3, which used an on-board computer system, embodied the ultimate invention. Even if all of these details were not apparent to the drivers, the nature of the endeavor in which they were participating was clearly experimental and would not have led them justifiably to believe the invention was available to the public. This alone does not negate the "public use" bar of § 102(b), but it does weigh against finding that the use in question was, in fact, "public use" at all.

## B. Nature of Field Trials

▆ The nature of the field trials also weighs against a finding of public use. As described above, this factor to some extent overlaps with the evidence that the field trials were experimental in nature. The '685 patent invention is a navigation system for automobiles, and thus it was necessary for the inventor to operate the vehicle on public roads in order to experiment with features of the invention in a manner that the invention would ordinarily be used. The nature of the use, however, remained clearly experimental at all times. For example, the inventors sat next to the drivers as they operated the vehicles and made modifications to software and other components as a result of observing the behavior of the drivers during the trials.

---

**10.** Although Judge Prost was speaking specifically in *Atlanta Attachment* about the § 102(b) on-sale bar, the same reasoning is applicable to the public use bar because both follow the same two-pronged analysis outlined in *Pfaff*. *See Invitrogen Corp.*, 424 F.3d at 1379–80.

## C. Public Access to the Use

■ The lack of public access to the use also weighs against a finding of public use. The inventors never relinquished control of the Back Seat Driver invention during the field trials. *See Moleculon Research Corp.*, 793 F.2d at 1266. The inventors were in the prototype vehicle at all times when the drivers operated it. They parked the prototype car in an MIT garage that required a card to access. The inventors never showed the drivers how the Back Seat Driver system worked, and the drivers were exposed to the workings of the system only to the extent that it was necessary to test it. People viewing the prototype vehicle from the street were unable to see that the drivers were using the Back Seat Driver system.

■ MIT contends that the field trials were conducted only by the researchers' "trusted friends, colleagues, and supporters," rather than by the public at large. The Supreme Court has held, however, that even the use of an invention by the inventor's wife or romantic interest could be an invalidating public use. *See Egbert v. Lippmann*, 104 U.S. 333, 335–38, 26 L.Ed. 755 (1881). Therefore, the identity of the drivers does not, by itself, prevent the field trials from being a "public use." More importantly, however, the control of the invention as maintained by the inventors weighs, in this case, strongly against a "public use" finding.

## D. Confidentiality Obligations

As an initial matter, MIT contends that the existence of confidentiality obligations remains a genuine issue for trial. It is undisputed that MIT had no express confidentiality agreement with the drivers of the prototype car during the field trials. MIT claims, however, that the drivers who participated in the field trials were under an implied confidentiality agreement or understood that they were not supposed to disclose any information regarding the Back Seat Driver project.

The evidence on this question is sparse. MIT relies primarily on the statements of Rittmueller, an NEC employee and one of the drivers of the prototype car, who stated that MIT keeps information "confidential-ish," although he believed MIT would have no direct recourse against him if he disclosed the information. MIT also relies on affidavit testimony from the inventors of the Back Seat Driver that academic ethical requirements theoretically prevented the drivers from taking credit for the inventors' work. Notably missing, however, is any testimony regarding any general implied duty of confidentiality that the inventors believed they had with the drivers. In fact, MIT is unable even to identify most of the drivers. Harman has similarly offered sparse evidence that an implied confidentiality agreement did not exist, aside from the general policy of "openness" that MIT had in order to further the pursuit of academic research and innovation.

I find insufficient evidence to conclude as a matter of law, for purposes of Harman's summary judgment motion, that MIT and the drivers of the prototype car lacked any implied duty of confidentiality. Nevertheless, for purposes of evaluating MIT's summary judgment motion, and construing the facts in a light most favorable to Harman, I will assume that most or all of the drivers involved in the field tests lacked a duty to keep information confidential. The lack of a confidentiality agreement weighs against granting MIT summary judgment on the public use issue. *See TP Labs., Inc.*, 724 F.2d at 972.

## E. Lack of Commercial Exploitation

The Magistrate Judge found that there was no commercial exploitation of the '685

patent during the field trials. Neither of the parties contests this finding. The lack of commercial exploitation of the Back Seat Driver weighs against invalidating the '685 patent under the public use bar. *See Invitrogen Corp.*, 424 F.3d at 1380.

### F. Underlying Policies

The policies underlying the public use bar in this setting support a finding of patent validity. The prototype vehicle with the Back Seat Driver invention was used primarily for experimentation and was never commercially exploited. Because the researchers did not use the invention for personal benefit or profit, affirming the validity of the '685 patent is not functionally equivalent to extending the monopoly on the Back Seat Driver past the statutory term. *See Pfaff*, 525 U.S. at 64, 119 S.Ct. 304. Furthermore, whatever the uncertainties about the identities of the drivers, the experimental nature of their use of the prototype could not have led them, let alone non-test drivers, to believe that the Back Seat driver was "freely available" or would become available to them for personal use. *See Bernhardt, L.L.C.*, 386 F.3d at 1379.

On the other hand, the public use bar favors the prompt dissemination of inventions, and the MIT researchers failed to apply for a patent as soon as their invention was reduced to practice. In other contexts, where more time has passed after the reduction to practice and the parallel activity of developing a defensible thesis was not involved, this failure to apply immediately for a patent might weigh against the validity of the patent. Overall, however, the policy reasons underlying the public use do not meaningfully support a finding of invalidity for the '685 patent.

### G. Conclusion

Harman has not demonstrated that no reasonable juror could fail to find by clear and convincing evidence that the '685 patent is invalid under the 35 U.S.C. § 102(b) public use bar. The specifically experimental nature of the field trials, reflecting the more generally non-public nature of the use, the lack of commercial exploitation and the policy rationale for the public use bar appear to weigh in favor of finding that the field trials were not a "public use." The lack or thinness of evidence regarding confidentiality obligations by the drivers may weigh in favor of public use, but that is not determinative. My own weighing of the evidence to the sides does not demonstrate as a matter of law whether a fact finder could find public use by clear and convincing evidence. A fact finder applying the clear and convincing standard could reasonably find for either the plaintiff or the defendant. Accordingly, I will deny both Harman and MIT summary judgment on the issue of invalidity under the § 102(b) public use bar.

### IV. Printed Publication Bar

MIT also sought summary judgment determining that claims 1, 42 and 45 of the '685 patent are not invalid under the § 102(b) printed publication bar because Davis's thesis on the Back Seat Driver project failed to qualify as a "printed publication" prior to the critical date. *See* 35 U.S.C. 102(b). Magistrate Judge Dein has recommended granting MIT summary judgment on this issue, and I will adopt her recommendation.

■■■ A patent is invalid under the § 102(b) printed publication bar if "the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent in the United States." 35 U.S.C. 102(b); *In re Wyer*, 655 F.2d 221, 222 (C.C.P.A.1981) (Rich, J.). The printed publication bar exists "to prevent withdrawal by an inventor, as the subject matter of a patent, of that which

was already in possession of the public." *In re Wyer,* 655 F.2d at 226.

 Under § 102(b), "printed publication" means that the publication "must have been sufficiently accessible to the public interested in the art" before the critical date. *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 1568 (Fed.Cir.1988) (citing *In re Hall,* 781 F.2d 897, 899 (Fed.Cir.1986); *see also In re Wyer,* 655 F.2d at 226–27). The "printed publication" determination must be made on a case-by-case basis. *See, e.g., In re Klopfenstein,* 380 F.3d 1345, 1350–52 (Fed. Cir.2004) (holding that an elaborate slideshow presentation where members of the public attended and took notes freely was a printed publication). Several key considerations as to whether a document was "published" under § 102(b) are "intent to make public, activity in disseminating information [and] production of a certain number of copies." *In re Wyer,* 655 F.2d at 227; *see also In re Cronyn,* 890 F.2d 1158, 1161 (Fed.Cir.1989) (holding that a thesis presentation made to a handful of faculty and not catalogued or indexed in a "meaningful" way was not a printed publication); *Mass. Inst. of Tech. v. AB Fortia,* 774 F.2d 1104, 1108–09 (Fed.Cir.1985) (holding that a paper was published when the inventor gave a presentation at a conference and gave a copy of the paper to the conference organizer who then distributed more copies).

As with the public use issue, Harman, which challenges the validity of the '685 patent, has the burden of proving by clear and convincing evidence that the Back Seat Driver invention was described in a printed publication before the critical date. *See* 35 U.S.C. 282; *SRI Int'l, Inc.,* 511 F.3d at 1192. To avoid summary judgment, Harman must show that a reasonable juror applying the "clear and convincing" evidence standard could find such a

printed publication. *See Anderson,* 477 U.S. at 254, 106 S.Ct. 2505. I find Harman has failed to show that MIT researchers disseminated the thesis and made it sufficiently accessible to the public such that it became a printed publication under § 102(b). *See Constant,* 848 F.2d at 1568.

The Magistrate Judge found that "Harman has failed to establish with any degree of certainty" that Rittmueller and Streeter received copies of the Back Seat Driver thesis prior to the critical date or that they believed they had no obligation to keep the thesis confidential. She also found a lack of evidence to establish that anyone freely distributed Davis's thesis prior to the critical date. She stated that Harman failed to supply evidence showing that Davis defended his thesis prior to the critical date. Furthermore, Harman failed to present any evidence regarding the nature of the thesis defense presentation, including the number of thesis copies, if any, that Davis distributed. Magistrate Judge Dein accordingly recommended that this Court grant MIT summary judgment on the printed publication bar issue.

 Harman objects to the R & R by contending that there are two genuine issues of material fact. First, Harman claims that a question of fact for trial is presented as to whether a complete copy of Davis's thesis was attached to the July 31, 1989 quarterly report. Even in the light most favorable to Harman, I find insufficient evidence to demonstrate that a copy of the thesis was attached. Moreover, Harman has presented no evidence to suggest that the thesis was freely disseminated or otherwise kept non-confidential as a result, which is the ultimate issue for purposes of the printed publication bar. *See Constant,* 848 F.2d at 1568. Harman observes that MIT presented no evidence regarding the dissemination of the thesis, but Harman cannot withstand summary

judgment simply on grounds that the party without the burden has adduced no evidence. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

■■■■ Second, Harman contends that a genuine issue of fact for trial is presented as to whether the date that Davis defended his thesis was before the critical date. Harman presents a flyer with handwritten corrections and a typo, which states that Davis's thesis defense is to take place on May 26, 1989, before the critical date. Davis and Schmandt testified that the flyer was a draft and in fact Davis defended his thesis at a later date. Against such evidence, Harman offers nothing in response. Further, even assuming that Davis did defend his thesis on the date on the flyer, Harman has presented no evidence of the nature of the presentation and dissemination of the thesis itself. A thesis presentation is not in itself a printed publication unless it has been made accessible to the public by being indexed, catalogued, and shelved. *See In re Cronyn,* 890 F.2d at 1161. Without more evidence regarding the timing and nature of the thesis presentation, Harman cannot demonstrate a genuine issue for trial regarding whether the thesis constituted a printed publication of the type that involves a statutory bar to patent validity.

Harman has failed to adduce sufficient evidence as measured by the clear and convincing standard to support patent invalidity under the printed publication bar. *See Mas–Hamilton Group,* 156 F.3d at 1216; *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Therefore, I adopt the recommendation of the Magistrate Judge and grant MIT summary judgment on the issue that claims 1, 42 and 45 of the '685 patent are not invalid under the § 102(b) printed publication bar.

## V. Conclusion

For the reasons set forth more fully above, I ADOPT the recommendation of the Magistrate Judge that MIT's motion for summary judgment against a claim of invalidity under the "printed publication" bar of 35 U.S.C. § 102(b) (Docket No. 159) be GRANTED and that MIT's motion for summary judgment against a claim of invalidity due to "public use" bar of 35 U.S.C. § 102(b) (Docket No. 159) be DENIED, and I otherwise conclude that the motion of Harman seeking summary judgment of invalidity on the basis of the "public use" (Docket No. 153) bar be DENIED.